UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PETER DIXON

                          Plaintiff

              -v-                                            5:20-CV-381

THE CITY OF SYRACUSE; Former Police
Officer AHMAD MIMS; Police Officer JACOB
BREEN; Police Officer PATRICK MOORE;
Police Officer NICHOLAS VOGEL; Police
Officer DAVID CRAW; Police Officer
LEONARD BROWN; Police Officer JOEL
DORCHESTER; Police Officer ANDREW
MURPHY; and Unidentified Police Officers
JOHN/JANE DOES,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:                                   OF COUNSEL:

THE LAW OFFICE OF FRED LICHTMACHER P.C.   FRED B. LICHTMACHER, ESQ.
Attorneys for Plaintiff
116 West 23rd Street, Suite 500
New York, New York 10011

HANCOCK ESTABROOK, LLP                         JOHN G. POWERS, ESQ.
Attorneys for Defendants
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

CITY OF SYRACUSE LAW DEPARTMENT                TODD M. LONG, ESQ.
Attorneys for Defendants
233 East Washington Street
300 City Hall
Syracuse, New York 13202

DAVID N. HURD
United States District Judge

## <u>MEMORANDUM–DECISION and ORDER</u>

**I.**   **<u>INTRODUCTION</u>**

On April 1, 2020, plaintiff Peter Dixon ("Dixon" or "plaintiff") filed a complaint in this Court alleging varied misconduct by defendant the City of Syracuse ("Syracuse" or "the city") and some of its police officers, including defendants Ahmad Mims ("Mims"), Jacob Breen ("Breen"), Patrick Moore ("Moore"), Nicholas Vogel ("Vogel"), David Craw ("Craw"), Leonard Brown ("Brown"), Joel Dorchester ("Dorchester"), and Andrew Murphy ("Murphy", the officers as a group "the individual defendants", and together with the city "defendants").   At its heart, the complaint alleges that defendants accosted plaintiff with no warning or reason, beat him, arrested him, and subjected him to a sham prosecution which the district attorney's office eventually dropped.   Defendants have moved to dismiss portions of the complaint, arguing that several of its claims are insufficiently pled.   That motion having been fully briefed, it will now be decided on the basis of the parties' submissions without oral argument.

**II.**   **<u>BACKGROUND</u>**

In 2017, Syracuse Police Department ("SPD") officers Mims, Breen, Moore, Brown, and Dorchester were members of a special unit called the Crime Reduction Team ("CRT"). Dkt. 12 ("AC"), ¶¶ 71, 72.[1]   That unit was tasked with curtailing illegal guns, drugs, and gangs in Syracuse.   *Id.* ¶ 37.   According to Dixon's complaint, these officers and the team as a whole developed a reputation for racial profiling and excessive force, which led to frequent complaints by the community and injuries among minority arrestees.   *Id.* ¶¶ 73-74. Nevertheless, plaintiff alleges a lack of disciplinary action by the city and SPD for these officers' purported abuses between 2012 and 2017.   *Id.* ¶ 79.

---

[1] The facts are taken from the amended complaint and any and all documents attached to it, because for the purposes of a Rule 12(b)(6) motion, this Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff[.]"   *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

But that is simply backdrop.  The story begins on April 22, 2017, when Dixon alleges he and his three children were sitting in his legally parked in his van ordering a pizza near Rowland Street in Syracuse.  AC ¶¶ 10-12.  Apparently unprompted, Mims approached plaintiff's window, flanked by another officer, while a third came to the van's passenger side window.  *Id.* ¶ 13.

To hear Dixon tell it, Mims demanded to see his identification, despite plaintiff's having committed no crime.  AC ¶ 15.  Plaintiff nevertheless complied.  *Id.*  Apparently, something about plaintiff's show of identification sparked a violent reaction from Mims, who drew his gun and begin to scream at plaintiff to lower the van's window.  *Id.* ¶ 16.  Plaintiff claims he could not comply, because the window was broken and replaced with plexiglass.  *Id.*  Plaintiff's noncompliance allegedly drew still more ire from Mims, who ordered him out of the van even as he punched in its window.  *Id.* ¶ 18.

Dixon alleges that Mims' violent rage put him in fear for his children's safety, so he attempted to drive away, though he did not drive quickly or dangerously.  AC ¶¶ 19-20.  But as plaintiff was beginning to turn his car away from Mims, he alleges that Vogel rammed his van with his police car.  *Id.* ¶ 21.  Craw was sitting in the passenger seat of Vogel's car during the collision.  Meanwhile, plaintiff claims that Mims opened fire on the van, hitting it at least twice, but missing its occupants.  *Id.*¶ 22.

Dixon nevertheless escaped, and in a moment of respite called his mother to alert her to his situation.  AC ¶ 24.  Plaintiff ultimately made it roughly seven miles before the police found him again and tried to stop him.  *Id.* ¶ 25.  He alleges that he was slowing the van to a stop when an unknown police officer struck him on his head through the window Mims had shattered earlier.  *Id.* ¶ 26.  An officer then ripped plaintiff out of the vehicle before he could stop it, and it continued to roll forward with his children inside.  *Id.*

3

According to Dixon, next he knew he was face down with Brown on his back.  AC ¶ 27. Plaintiff claims Brown, as well as Dorchester, Murphy, and other officers, started beating him, striking him in the face, body, back, and legs.  *Id.*  No other officer intervened.  *Id.*

Dixon alleges that eventually he was handcuffed and placed in a police car, only to be punched once again.  AC ¶ 28.  The police then took plaintiff to the hospital but apparently prevented the hospital workers from properly examining him.  *Id.* ¶ 29.  Next, the officers took plaintiff to the SPD for interrogation, despite his injuries.  *Id.*  While in custody, plaintiff did not receive any further medical treatment.  *Id.* ¶¶ 30, 33.

Dixon claims that because of the beating the individual defendants inflicted on him, he suffered a head injury that caused pain and dizziness.  AC ¶ 31.  Additionally, he alleges that the individual defendants reinjured a fractured lumbar he had suffered years earlier, which continues to cause him pain to this day.  *Id.* ¶ 35.

Dixon was eventually arrested and charged as a result of his interrogation.  AC ¶ 32. Plaintiff is adamant that the charges were always false.  *Id.* ¶ 36.  Plaintiff further alleges that the charges were fabricated by the officers he has identified as defendants in this case. *Id.* ¶ 66.  To his point, the District Attorney allegedly found Mims to be unreliable and dismissed the charges against him.  *Id.* ¶ 36.  According to plaintiff, Mims was subsequently forced to resign from SPD after still more acts of unconstitutional violence.  *Id.*  Moreover, plaintiff alleges that the mounting complaints resulted in SPD disbanding the entire CRT.  *Id.* ¶ 38.

On April 1, 2020, Dixon filed the present complaint, calling for relief for violations of his constitutional rights under 42 U.S.C. § 1983[2] ("§ 1983") across eight counts:  (I) excessive

---

[2] Section 1983 claims allow a plaintiff to bring civil rights claims against state actors.  42 U.S.C. § 1983. However, two elements must be present for all § 1983 claims:  "(1) the conduct complained of must have been committed by a person acting under state law; and (2) the conduct complained of must have deprived a person

force in violation of the Fourth Amendment; (II) failure to intervene in violation of the Fourth Amendment; (III) false arrest in violation of the Fourth Amendment; (IV) malicious prosecution;[3] (V) denial of his rights to a fair trial and due process in violation of the Sixth and Fourteenth Amendments;[4] (VI) liability attributable to Syracuse for the other assembled violations under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); (VII) racial profiling in violation of the equal protection clause of the Fourteenth Amendment;[5] and (VIII) illegal stop in violation of the Fourth Amendment.  On May 19, 2020, plaintiff filed the amended complaint, the current operative pleading.

On June 26, 2020, defendants moved to dismiss portions of the amended complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim for which relief can be granted and 12(b)(5) for insufficient service of process.

### III.  <u>LEGAL STANDARD</u>

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Instead, the complaint must contain sufficient factual matter that it presents a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In assessing the plausibility of the plaintiff's complaint, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor."

---

of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  .

[3] Though plaintiff frames his malicious prosecution claim as coming under the Fourth Amendment, the Court takes no position at this time as to which amendment to the Constitution protects that right.

[4] To whatever extent plaintiff relies on the Fifth Amendment for his claim of a right to a fair trial, that claim must be dismissed because the Fifth Amendment only applies to federal—and not state—actors.  *Dusenberry v. United States*, 534 U.S. 161, 167 (2002).

[5] Again, plaintiff relies on the Fourth Amendment in his complaint, but for reasons discussed below racial profiling claims are construed as violations of a plaintiff's rights to Equal Protection under the Fourteenth Amendment.

*Ginsburg*, 839 F. Supp. 2d at 540.  The complaint may be supported by "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

## IV.   <u>DISCUSSION</u>

Defendants moved to dismiss seven portions of the Amended Complaint by arguing that Dixon has failed to:  (1) properly allege a *Monell* claim opening the City of Syracuse to liability; (2) differentiate his claim for denial of a fair trial from his malicious prosecution claim; (3) adequately plead either intentional discrimination or selective enforcement to support his racial profiling claim; (4) differentiate his illegal stop claim from his false arrest claim; (5) properly serve Mims; (6) allege personal involvement for Breen, Moore, and Craw; and (7) state a failure to intervene claim against Mims and Vogel.  Defendants have since conceded their argument that Mims' service was improper.  The remaining six arguments will be addressed in turn.

### A. Plaintiff's *Monell* Claim.

That municipalities cannot be held liable for § 1983 claims under traditional theories of vicarious liability is a well-worn path.  *Monell*, 436 U.S. at 694-95.  Instead, the Supreme Court commands that the constitutional violation underpinning a § 1983 claim against a municipality must result from a governmental policy, custom or practice.  *See id.* at 694.

The Supreme Court has further endorsed four methods of proving out the policy, custom or practice requirement.  First, and most obviously, a plaintiff can allege that a formal policy exists subjecting the municipality to liability.  *Monell*, 436 U.S. at 690.  Second, a plaintiff can allege that a policy-making official for the municipality caused a deprivation of his

constitutional rights.  *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404-06 (1997).  Third, a plaintiff can demonstrate that a practice was so consistent and widespread that it constitutes a tacit custom that "is so widespread as to have the force of law."  *Id.* at 404.  Fourth and finally, a plaintiff can prove that policymakers failed to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who interact with municipal employees.  *Id.* at 407.

Under any of these methods of ascribing liability for a constitutional violation to a municipality, a plaintiff must also demonstrate a direct causal link between the policy and the alleged injury.  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  Given the assorted hurdles to municipal liability, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (citing *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

As defendants correctly note, the amended complaint is not a marvel of clarity as to what theory of *Monell* liability Dixon intends to prove.  Moreover, plaintiff's response in opposition to defendants' Rule 12 motion does little to clear the muddied waters. Nevertheless, reading the complaint liberally in plaintiff's favor, his allegations of SPD's, and specifically the CRT's, ongoing rights violations and the lack of resulting disciplinary action suggest plaintiff is trying to allege either a widespread, consistent practice providing implied notice to policymakers or inadequate training or supervision to such an extent that it constitutes deliberate indifference.  *Brown*, 520 U.S. at 404, 407.

The Second Circuit has recognized that even in the absence of a concrete policy directing municipal employees' behavior, persistent, widespread discriminatory practices of municipal officials can be "so permanent and well[-]settled as to constitute a 'custom or

7

usage' with the force of law[.]"  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)).  But for the actions of subordinate employees, as opposed to upper-level policymakers, the discriminatory practice "must be so manifest as to imply the constructive acquiescence of senior policy[]making officials."  *Sorlucco*, 971 F.2d at 871.  Essentially, this *Monell* theory holds the municipality accountable under a theory of constructive acquiescence.  *See Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019).

Alternatively, under the fourth theory of *Monell* liability, the Second Circuit has held that "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*."  *Batista*, 702 F.2d at 397.  "However, such a failure to act, train, or supervise can constitute a municipal custom only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need."  *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 500 (N.D.N.Y. 2017) (internal citations and quotation marks omitted).

Moreover, it is worth stressing that "[t]he 'deliberate indifference' test is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Hulett*, 253 F. Supp. 3d at 500 (internal citations and quotation marks omitted); *see Brown*, 520 U.S. at 410.

Defendants argue that plaintiff has failed under either possible method of proving a policy, custom or practice.  After all, plaintiff's only allegations that point toward *Monell* liability are:  (1) his own alleged experience of unconstitutional treatment; (2) the CRT's eventual disbandment due to unconstitutional conduct; (3) allegations that Syracuse directed the CRT

to racially profile minorities; (4) the city's implicit awareness of the CRT's misbehavior based on "excessive number[s] of complaints" and a "large number" of people belonging to minority groups being injured during the course of being arrested by the CRT; and (5) the city's alleged refusal to discipline its police department for unconstitutional conduct.  AC ¶¶ 10-36, 71-74, 79.

Admittedly, several courts confronted with somewhat similar allegations have disposed of *Monell* claims at the motion to dismiss stage.  *See, e.g.*, *Cipolloni v. City of New York*, 758 F. App'x 76, 79 (2d Cir. 2018) (summary order) (affirming lower court's ruling that allegations that "available evidence, and common sense" indicates systemic problem with database reached multiple people insufficient to attach *Monell* liability); *Arrindel-Martin v. City of Syracuse*, 2018 WL 6622193, at *5-6 (N.D.N.Y. Dec. 18, 2018) (dismissing complaint because allegations of "frequent instances" of excessive force and "numerous instances of . . . substantiat[ed] complaints of excessive force" are insufficient to plausibly allege pattern of conduct).

However, it must be said that several courts have come down on the opposite side of similar questions as well.  *See, e.g.*, *Kavanaugh v. Vill. of Green Island*, 2016 WL 7495813, at *6 (N.D.N.Y. Dec. 30, 2016) (ruling that allegation of failure to train employees to intervene and prevent the use of excessive force allows plaintiff's *Monell* claim to survive Rule 12(b)(6) motion); *Best v. Vill. of Ellenville*, 2014 WL 6387146, at *2 (N.D.N.Y. Nov. 14, 2014) (adopting report and recommendation allowing *Monell* claim to proceed past Rule 12(b)(6) motion when plaintiff only alleged his own unconstitutional treatment, poor training, and officers being fired for misconduct); *Vasconcellos v. City of New York*, 2014 WL 4961441, at *13 (S.D.N.Y. Oct. 2, 2014) (denying motion to dismiss *Monell* claim because plaintiff alleged city failed to train officers).

The Court does not dispute that Dixon's allegations of Syracuse's liability are threadbare, but two considerations compel ruling in Dixon's favor. First, given Syracuse's control of access to its training processes and any specific instances of officer misconduct or disciplinary measures, "it is hard to fathom how . . . plaintiff could provide more detail at the pleading stage regarding a *Monell* claim based on failure to train" than he already has without allowing him discovery. *Kimbrough v. Town of Dewitt Police Dep't*, 2010 WL 3724017, at *6 (N.D.N.Y. Sept. 15, 2010). And second, precisely because it is a close question, and given the gravity of plaintiff's allegations, the benefit of the doubt should be resolved in a nonmovant plaintiff's favor. *Cf. Staehr v. Hartford Fin. Sevs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008) (noting that reasonable inferences should be resolved in plaintiff's favor on Rule 12(b)(6) motions).

Accordingly, Dixon has stated a plausible claim for Syracuse to be liable under either the widespread custom or failure to train and supervise theories of *Monell* liability, albeit barely. His claim must thus survive defendants' Rule 12(b)(6) motion.

### B. Plaintiff's Fair Trial Claim.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under . . . § 1983." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 275 (2d Cir. 2016) (quoting *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

In a more digestible form, a plaintiff alleging a violation of his right to a fair trial based on fabricated evidence must prove that "(1) an investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and

(5) the plaintiff suffers a deprivation of liberty as a result." *Miller v. Terrillion*, 436 F. Supp. 3d 598, 601 (E.D.N.Y. 2020) (cleaned up).

Defendants argue that Dixon's claim for defendants' alleged violation of his right to a fair trial is duplicative of his claim for malicious prosecution.  In making that argument, defendants steer this Court toward waters that are equal parts choppy and uncharted.  After all, in the past three and a half years alone, the Supreme Court has twice considered what remedies § 1983 contemplates for a criminal defendant charged with a crime through some measure of police misconduct.

First, in *Manuel v. City of Joliet*, the Supreme Court granted certiorari on the question of whether § 1983 allowed for a malicious prosecution claim relying only on the Fourth Amendment, covering the subset of cases where a plaintiff was falsely charged and arraigned but the charges were dropped before trial could begin.  137 S. Ct. 911, 919-22 (2017).  In other words, the *Manuel* Court considered whether the Fourth Amendment reached further than a false arrest claim to cover a § 1983 plaintiff's detention prior to trial but after legal process had begun.  *Id.*

The Supreme Court answered that question in the affirmative, holding that a plaintiff could recover for the injury of being incarcerated without probable cause after the start of legal process.  *Manuel*, 137 S. Ct. at 919-22.  However, the *Manuel* Court declined to consider whether a malicious prosecution claim should be the vehicle for that recovery.  *Id.* at 919-22 & n.10.  In the process, the Supreme Court also declined to decide whether the Fourth Amendment claim it allowed for accrued upon a favorable termination of the criminal prosecution or on the filing of the charges.  *Id.* at 921-22.

At first blush, that question appears to have been taken up by the Supreme Court in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), but careful comparison reveals that the scope

11

of *McDonough* is more limited, and the two cases are at best tangentially related. The *McDonough* Court ultimately held that state law malicious prosecution claims were the closest analogy to a § 1983 claim alleging deprivation of a plaintiff's right to a fair trial for the purposes of determining when that § 1983 claim would accrue. *Id.* at 2154-59. By extension, the Supreme Court held that a right to fair trial claim for fabricated evidence only accrued upon the plaintiff's reaching a favorable result in the underlying criminal case. *Id.* at 2158. In any event, neither of these two cases says much about whether a malicious prosecution claim and a right to a fair trial claim can coexist.

Defendants nevertheless hope to tame this wild and unsettled region of caselaw through a footnote in the Second Circuit's decision in *Dufort v. City of New York*, 874 F.3d 338, 355 n.7 (2d Cir. 2017). That footnote disposed of a potential substantive due process claim hidden in its plaintiff's complaint by noting that it was coextensive with that plaintiff's false arrest and malicious prosecution claims. *Id.* In so doing, the *Dufort* Court characterized *Manuel* in parenthetical citation as standing for the proposition that "claims for pretrial detention based on fabricated or withheld evidence are evaluated as malicious prosecution claims under the Fourth Amendment . . . ." *Id.* (citing *Manuel*, 137 S. Ct. at 917-19).

By defendants' logic, *Dufort* is dispositive, because Dixon's claim is one of fabricated evidence and thus should be construed as a malicious prosecution claim under the Fourth Amendment. But that logic is erroneous on four counts.

First, the Second Circuit never stated that a Fourth Amendment malicious prosecution claim was the *only* path to remedy when a plaintiff alleges detention due to fabricated evidence. *Dufort*, 874 F.3d at 355 n.7. It merely suggested that this was one path to that remedy.

Second, although the *Dufort* footnote served its purpose of explaining that its plaintiff's due process claim was coextensive with two of his other claims, if this Court were to extend its reach so that all claims for fabricated evidence must only come as malicious prosecution claims under the Fourth Amendment, it would mangle *Manuel*'s actual ruling for the benefit of a Second Circuit explanatory parenthetical purporting to summarize that same case. *Dufort*, 874 F.3d at 355 n.7. After all, *Manuel* explicitly declined to consider whether a malicious prosecution claim was the proper vehicle to vindicate a plaintiff's right not to be imprisoned in the absence of probable cause. 137 S. Ct. at 919-22 & n.10. The Second Circuit in *Dufort* could of course have ruled that it was, but this Court is unwilling to assume that it casually made that ruling through a parenthetical attached to a citation to the case it would be extending. 874 F.3d at 355 n.7 (citing *Manuel*, 137 S. Ct. at 917-19).

Third, the portion of the footnote on which defendants rely is the height of dicta, being an explanatory parenthetical in a footnote addressing a claim that may or may not have ever existed. *Dufort*, 874 F.3d at 355 n.7. As such, even if it did affirmatively limit the remedy for plaintiff's claim to malicious prosecution, the Court is not bound to follow where it leads even though it comes from an authoritative Second Circuit opinion. *See Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 107 (2d Cir. 2006) (noting that dicta cannot be binding) (citing *United States v. Garcia*, 413 F.3d 201, 232 n.2 (2d Cir. 2005) (Calabresi, J., concurring)).

Fourth and finally, defendants misunderstand how accrual—and by extension the contours of a § 1983 claim in general—is determined. It is not what the defendants allegedly did that determines the scope and availability of a claim. Instead, "accrual analysis begins with identifying the specific constitutional right alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (internal quotation marks omitted) (citing *Manuel*, 137 S. Ct. at 920). As a

13

consequence, "certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." *Garnett*, 838 F.3d at 278 (cleaned up).

So although it is certainly true that Dixon is trying to support two different claims using the same factual predicate of the individual defendants' fabrication of evidence to prosecute him, he is also calling for the vindication of two different rights allegedly infringed by that single act. *See Garnett*, 838 F.3d at 278 (noting that single wrongful act can violate multiple constitutional protections). In fact, the Second Circuit in *Garnett* explicitly held that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Id.* By contrast, defendants' favored footnote of *Dufort* only discussed claims for pretrial detention, it made no mention of the right to a fair trial, which plaintiff hopes to vindicate in this case.

Nothing in either *Manuel* or *McDonough* suggests that *Garnett* is now bad law. *Manuel* purely dealt with claims for pretrial confinement under the Fourth Amendment. 137 S. Ct. at 919-22. Ruling that such a claim exists says absolutely nothing about the independent vitality of twin fair trial and malicious prosecution claims. *Manuel* is thus plainly inapposite, and defendants' reliance on it is misplaced. The language from that case which defendants rely on stands only for the proposition that a plaintiff maintains a right to recover under the Fourth amendment even after legal process has begun. *Id.* Using language designed to maintain a plaintiff's Fourth Amendment rights from being swallowed by his litigative rights to then feed those litigative rights to his Fourth Amendment rights would only stymie *Manuel*, not carry its implications forward.

*McDonough*'s use of malicious prosecution as an analogy for a fabricated evidence claim solely for the purposes of accrual similarly does not dispel *Garnett*. 139 S. Ct. at 2154-59. As the *McDonough* Court itself noted, analogies to state law claims "are meant to

guide rather than to control the definition of § 1983 claims such that the common law serves more as a source of inspired examples than of prefabricated components." *Id.* at 2156 (cleaned up) (citing *Manuel*, 137 S. Ct. at 920).

The Court is thus loath to take the Supreme Court's analogy to clarify one element—in plaintiffs' favor—of a right to fair trial claim hinging on fabricated evidence as the bane to established Second Circuit precedent allowing simultaneous fair trial and malicious prosecution claims.  Accordingly, the Court will allow Dixon's claims for a right to fair trial and malicious prosecution both to proceed.[6]  *See, e.g.*, *Galgano v. Cty. of Putnam*, 2020 WL 3618512, at *9 (S.D.N.Y. July 2, 2020) (allowing malicious prosecution and due process claim for fabricated evidence to proceed as not duplicative).

### C. Plaintiff's Racial Profiling Claim.

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  Particularly, the Equal Protection Clause affords a "constitutional basis for objecting to intentionally discriminatory application of laws . . . ." *Id.*  As such, most courts in this Circuit to consider racial profiling claims under § 1983 have construed them as a subspecies of equal protection claim. *See, e.g.*, *Jennings v. Decker*, 359 F. Supp. 3d 196, 205 n.12 (N.D.N.Y. 2019) (collecting cases for proposition that courts treat racial profiling claims as equal protection claims).

As defendants correctly note, there are two types of equal protection claims Dixon could be asserting:  intentional discrimination or selective enforcement.  Intentional discrimination comes in three variants, namely when:  (1)  a law or policy "expressly classifies persons on the basis of race"; (2) a facially neutral law or policy has been applied with intent

---

[6] Defendants argue for the first time in reply that plaintiff's claim for a right to fair trial is insufficiently pleaded. Because courts in this Circuit do not consider arguments unique to a reply brief, the Court will not consider this argument now. *See Evangelista v. Ashcroft*, 359 F.3d 145, 155 n.4 (2d Cir. 2004) (noting that Second Circuit "will not consider an argument raised for the first time in a reply brief").

to discriminate; or (3) a "facially neutral statute or policy has an adverse effect" which was motivated by "discriminatory animus."  *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).  Under any of the three theories, "the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened because the person is a member of the racial group."  *Williams v. Calderoni*, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012).

Alternatively, Dixon's complaint could also be read to present a selective enforcement claim.  A selective enforcement claim requires a plaintiff to prove that "(1) the person, compared with others similarly situated, was selectively treated[;] and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race . . . ."  *Hsin v. City of New York*, 779 F. App'x 12, 14-15 (2d Cir. 2019) (summary order) (citing *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).

Under either formulation, Dixon has adequately pled an intention to discriminate. Defendants are correct in arguing that many of his discrimination allegations are conclusory in nature, but plaintiff has nevertheless plausibly alleged that the CRT and the SPD in general have policies of excessive force and racial profiling targeting African Americans despite recurring complaints on the same subject.  AC ¶¶ 71, 73, 80, 82.  Because plaintiff has plausibly alleged a policy of racial profiling on Syracuse's part, it follows that SPD officers carrying out that policy would be acting intentionally.  This is especially true given plaintiff's allegations of the CRT's repeated abuses, because it is permissible to infer a discriminatory animus when the same people allegedly are repeatedly singled out in complaints of unconstitutional conduct.

Moreover, it bears repeating that it is difficult to imagine how plaintiff could have mustered more detailed allegations of racial animus in the absence of discovery.  *See Kimbrough*, 2010 WL 3724017, at *6 (noting relaxed expectations for production by plaintiffs in Rule 12(b)(6) motions).  Accordingly, plaintiff's Count VII equal protection claim must survive.

### D.  <u>Plaintiff's Illegal Stop Claim.</u>

Defendants next argue that Dixon's Count VIII illegal stop claim under the Fourth Amendment is subsumed by his Count III false arrest claim under the same amendment.  To defendants' point, plaintiff has provided nothing to differentiate these claims from each other, except for the allegation that the illegal stop put plaintiff in fear of being sent to jail.  *Compare* AC ¶¶ 50-54, *with id.* ¶¶ 91-95 (same for Count VIII).  Even still, an arrest would produce the same fear, making both the factual predicate and the relevant right presented by plaintiff's allegations—namely to be free of unlawful search and seizure under the Fourth Amendment—identical.

Accordingly, Dixon's Count VIII illegal stop claim must be dismissed as duplicative. *See, e.g.*, *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (dismissing unlawful seizure claim as duplicative of false arrest claim).  Moreover, because plaintiff's Count VIII claim has been so completely swallowed, any amendment to this count that would allow it to proceed would require plaintiff to essentially devise an entirely new claim, making any amendment futile.  Dismissal must thus be with prejudice.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (noting that dismissal of plaintiff's claim with prejudice without opportunity to amend is appropriate where amendment would be futile).

17

### E. **Plaintiff's Claims Against Breen, Moore, and Craw.**

Defendants next move to a more general defense. Specifically, they argue that Dixon has failed to allege any individual action on the part of Breen, Moore, or Craw. It is of course true that a § 1983 claim requires a plaintiff to show a defendant's personal involvement in an alleged constitutional deprivation. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

To that end, Dixon's total allegations of involvement against Craw are that he rode in the passenger seat as Vogel rammed plaintiff's van. AC ¶ 21. He has no concrete allegations at all against Breen or Moore. He does, however, state at multiple points in the Amended Complaint that there were other officers, who he does not name, present both at Mims' initial stop and at his eventual arrest. *Id.* ¶¶ 13, 27. He also alleges that Breen and Moore are both members of the CRT. *Id.* ¶ 38.

Between Breen and Moore's membership in the same team that Dixon alleges engaged in widespread racial profiling and rights abuses and the complaint's inclusion of unnamed officers present at each of his interactions with police, plaintiff has plausibly—albeit barely—alleged that Breen and Moore had direct involvement in the violations he alleges. Contrary to defendants' arguments, there are facts in the complaint by unidentified officers, and plaintiff has offered sufficient allegations to allow for a plausible inference that Breen and Moore, being on the same team as many of the other officers allegedly involved, were among them.

Similarly, notwithstanding defendants' arguments to the contrary, it is plausible that Craw had an opportunity to intervene in Vogel's alleged ramming of Dixon's van. First, although defendants are correct that plaintiff's excessive force claim focuses on the arresting officers' allegedly beating him, his excessive force claim nevertheless reiterates every

18

preceding paragraph, which of course includes the crash.  AC ¶ 39.  Second, it is telling that every case defendants cite disposing of a claim against a passenger in a car for failure to intervene comes either at summary judgment or after trial.  *See, e.g.*, *Pierce v. City of New York*, 293 F. Supp. 3d 306, 313 (E.D.N.Y. 2017) (holding that evidence against defendant was insufficient on post-trial motions because defendant was only passenger in police car during chase).  Accordingly, plaintiff's claims against Breen, Moore, and Craw must survive.

### F.  Plaintiff's Failure to Intervene Claims Against Mims and Vogel.

Finally, defendants argue that Dixon has failed to allege that Mims and Vogel, as active participants in plaintiff's excessive force claims who were not named as being present in any other interaction, could be held liable for failing to intervene in the other officers' alleged misconduct.

Defendants are correct that a defendant "may not be held liable both for using excessive force and for failing to prevent the use of excessive force."  *Watson v. City of Kingston-Kingston Police Dep't*, 2018 WL 4509488, at *4 (N.D.N.Y. Sept. 19, 2018).  And defendants are also correct that the only allegations against Mims and Vogel are that Mims confronted Dixon and punched and shot at his van and that Vogel rammed plaintiff's van as he tried to drive away.  AC ¶¶ 13-18, 21.  However, making every reasonable inference in plaintiff's favor, it is plausible that defendants could each have intervened in the other's actions, and it is also plausible that these officers were among the unnamed officers present for plaintiff's alleged beating.  As such, it would be improper to dismiss a failure to intervene claim against either officer at only the pleading stage.  Accordingly, plaintiff's failure to intervene claims against Mims and Vogel must survive.

19

## V.    CONCLUSION

Defendants' assault on Dixon's amended complaint spanned from novel legal questions to well-worn challenges to the adequacy of the complaint's factual allegations.  In no case could their attacks be dismissed out of hand.  Indeed, clearer and more careful pleadings on plaintiff's part would have greatly simplified matters.  Even still, most of defendant's arguments would be better saved for summary judgment.  Until that time, plaintiff's complaint must remain as it was, save only for his illegal stop claim.

Therefore, it is

ORDERED THAT

1.  Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART;

2.  Plaintiff Peter Dixon's Count VIII claim under 42 U.S.C. § 1983 for an illegal stop is DISMISSED WITH PREJUDICE;

3.  Defendants' motion to dismiss is DENIED in all other respects; and

4.  All defendants are directed to answer plaintiff Peter Dixon's Amended Complaint no later than Thursday, October 15 2020.

IT IS SO ORDERED.

Dated:  September 30, 2020
        Utica, New York.

David N. Hurd
U.S. District Judge